## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

LINDA R. WYMER              )
                                    )
         **Plaintiff,**      )
                                    )
        **v.**              )      **Case No. 3:24-cv-0041**
                                    )
**UNITED STATES OF AMERICA,**   )
                                    )
         **Defendant.**    )
                                    )

**ATTORNEYS:**

**JOHN P. FISCHER, ESQ.**
FISCHER REDAVID, PLLC
SUNRISE, FLORIDA 33326
     *FOR PLAINTIFF LYNDA R. WYMER.*

**ANGELA TYSON-FLOYD, ASSISTANT UNITED STATES ATTORNEY**
UNITED STATES ATTORNEY'S OFFICE
ST. CROIX, U.S. VIRGIN ISLANDS
     *FOR DEFENDANT UNITED STATES OF AMERICA*

## <u>MEMORANDUM OF DECISION</u>

**MOLLOY, Chief Judge.**

**THIS MATTER** came before the Court at the bench trial held on January 16-17, 2026, on Plaintiff Lynda Wymer's ("Plaintiff") claim of negligence filed in her Second Amended Complaint on October 30, 2024. (ECF No. 13-2.) Defendant United States of America, through the U.S Customs and Border Protection ("CBP") filed its Answer on January 22, 2025. (ECF No. 21.) The following individuals testified at the bench trial: Julie Cruz, CBP Special Agent Peter Hearn, CBP Special Agent Raymond Wert, CBP Supervisory Marine Interdiction Agent Justin Frechette, Plaintiff, and Plaintiff's medical expert, Dr. Carmen M. Quinones. The testimony of Virgin Islands Police Officer Doralyn T. Charles was presented by pre-recorded video.

This case stems from an automobile accident that occurred on November 29, 2022. In February 2024 Plaintiff submitted an administrative tort claim to CBP claiming damages in

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 2 of 24

the amount of $257,743.98 incurred as a result of that automobile accident. (ECF No. 1-2.) Plaintiff reported property damage in the amount of $7,743.98 and personal injury damages in the amount of $250,000. (ECF No. 68 at ¶41.) On April 3, 2024, CBP denied Plaintiff's administrative tort claim. (ECF No. 66 ¶45.) This lawsuit followed.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court issues the following findings of fact and conclusions of law:

## I.    FINDINGS OF FACT

1. At or around noon on November 29, 2022, Plaintiff was traveling westward on Weymouth Rhymer Highway, St. Thomas, U.S. Virgin Islands, in a 2010 White Ford Escape.

2. At the same time, Peter Hearn ("Hearn"), an employee and special agent of Defendant U.S. Customs and Border Protection, was also traveling westbound on Weymouth Rhymer Highway a few car lengths behind Plaintiff in a 2020 Chevy Silverado.

3. Hearn had just picked up the Chevy Silverado—a government vehicle—from Caribbean Auto Mart and was in route to the St. Thomas U.S. Customs and Border Protection Marine Unit.

4. Hearn was followed by Raymond Wert, a coworker who had given him a ride to Caribbean Auto Mart.

5. There was moderate traffic on Weymouth Rhymer Highway at the time.

6. Weymouth Rhymer Highway has one westbound lane and one eastbound lane, with an eastbound center turning lane at the intersection with New Hernhut Road.

7. New Hernhut Road intersects Weymouth Rhymer Highway from the south and ends at the intersection.

8. Plaintiff slowed down to make a left turn onto New Hernhut Road.

9. Hearn did not observe a left turn signal at the rear of Plaintiff's vehicle.

10. Hearn believed Plaintiff intended to drive straight through the intersection at New Hernhut Road to make a right turn at the following intersection.

11. Hearn testified that he observed Plaintiff's vehicle veer to the right, out of his path of travel, so he continued straight ahead in his lane.

12. Hearn attempted to pass Plaintiff's vehicle on the left side to continue straight on Weymouth Rhymer Highway.

13. Plaintiff testified that she came to a complete stop at the intersection, and then proceeded to make a left turn onto New Hernhut Road.

14. Plaintiff initiated a left turn as Hearn was approaching the intersection with New Hernhut Road and attempting to pass by Plaintiff on her left side.

15. The two vehicles collided at or near the intersection.

16. Plaintiff's Ford Escape struck the right side of the Chevy Silverado driven by Hearn.

17. The Chevy Silverado sustained damage to the right front and back doors.

18. Plaintiff's Ford Escape sustained damage to the left side of the vehicle to include, but not limited to the left front bumper cover, the grille, left front lamp assembly, left fender liner and panel, the left front body brace and radiator support, left front control arm and strut, and left wheel hub.

19. Special Agent Wert, who was driving behind Hearn witnessed the accident.

20. Hearn contacted 9-1-1.

21. Wert contacted Justin Frechette, his supervisor at the CBP-AMO field office.

22. Frechette was first to arrive on the scene and took photographs of the damaged vehicles and the surrounding area of the accident.

23. Virgin Islands Police Officer (VIPD) Doralyn Charles ("Officer Charles") subsequently arrived in response to the 9-1-1 call and interviewed both Plaintiff and Hearn; Officer Charles did not interview Raymond Wert.

24. Hearn and Plaintiff noticed that the left turn signal was flashing on the inside of Plaintiff's vehicle, but the left turn signal was not illuminated on the exterior at the rear of Plaintiff's vehicle.

25. Officer Charles cited Hearn for negligent driving due to improperly passing a vehicle in violation of 20 V.I.C. § 503.

26. On December 1, 2022, Plaintiff visited the emergency room at Roy L. Schneider Regional Medical Center ("SRMC"), complaining of neck, shoulder, back, hand and wrist pain.

27. On December 1, 2022, Plaintiff was discharged from the emergency room at SRMC with a diagnosis of lumbar strain and advised to follow up with her primary care doctor if symptoms changed or worsened. She was given a Toradol 30 mg intramuscular injection for

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 4 of 24

pain while in the emergency room and was prescribed Motrin 600 mg (three times a day) and Flexeril 10 mg (once a day at bedtime).

28. Upon discharge Plaintiff was advised to rest, and she took sick leave from work from December 1 to 4, 2022.

29. On or about December 20, 2022, Plaintiff saw Carolyn Jones, M.D., Plaintiff's primary physician, who diagnosed Plaintiff with back and neck pain.

30. Plaintiff continued with follow up treatment for her injuries with Dr. Jones.

31. Dr. Jones referred Plaintiff to physical therapy two to three times a week for four weeks.

32. On January 19, 2023, Dr. Jones prescribed additional physical therapy; Plaintiff received physical therapy treatments at Synergy Fitness and Wellness Center on St. Thomas, from December 22, 2022, to April 7, 2023.

33. On March 22, 2023, a hearing on the negligent driving citation against Hearn was held before Superior Court Magistrate Judge Simone VanHolten Turnbull; The Magistrate Judge dismissed the traffic citation against Hearn.

34. Dr. Jones referred Plaintiff to Carmen Quinones, M.D. at Virgin Islands Orthopedics & Medical Specialists.

35. Complaining of constant back pain, Plaintiff first saw Dr. Quinones on June 15, 2023.

36. Plaintiff was treated by Dr. Quinones for back pain from June 15, 2023, to April 28, 2025.

37. Magnetic Resonance Imaging ("MRI") of Plaintiff's spine was performed three times at St. Thomas Radiology and Associates, Inc. between September 2023 and November 2024 for comparative analysis.

38. On five occasions between October 6, 2023, and February 18, 2025, Dr. Quinones performed in-office procedures on Plaintiff that included injections of pain medication in the lumbar and sacroiliac joint, as well as radiofrequency ablation, to relieve Plaintiff's back pain.

39. Treatments thus far have not alleviated Plaintiff's back pain.

40. Treatments have included pain medication, physical therapy, MRI analyses, L4-5 and L5-S1 facet joint nerve blocks on October 6, 2023, and March 26, 2024, sacroiliac joint steroid injection on May 24, 2024, bilateral L4-5, L5-S1 facet joint radiofrequency ablation on

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 5 of 24

September 17, 2025, and L5-S1 interlaminar epidural steroid injection on February 18, 2025. (Ex. 31, 33, 39.)

41. The MRI of Plaintiff's lumbar spine on September 15, 2023, showed L4-5 disc bulge with moderate to severe facet arthropathy; L4-L5 mild spinal stenosis and severe left and moderate to severe right foraminal narrowing; L5-S1 disc bulge with moderate to severe left and moderate right neural foraminal narrowing; L5-S1 moderate facet arthropathy.

42. Dr. Quinones' medical report submitted at the hearing listed Plaintiff's current diagnosis as "Lumbar spondylosis" and "Lumbar osseous neural canal stenosis." (Ex. 40.)

43. Dr. Quinones testified that within a reasonable degree of medical certainty, Plaintiff's injuries and need for treatment are causally related to the car accident at issue, that Plaintiff had preexisting lumbar degenerative changes that were permanently aggravated by the car accident in this case, and that Plaintiff's prognosis for recovery without more invasive intervention is poor. (*See also* Ex. 40.)

44. On or about December 19, 2024, Plaintiff was evaluated by Dr. John Shuster, who informed Plaintiff that as a last resort she may have to consider spinal fusion surgery that would require a long recovery. *Id*.

45. Plaintiff is a 72-year-old widow, and she was 69 years old at the time of the accident.

46. Prior to the car accident in this case, Plaintiff had never experienced symptoms of back pain.

47. Plaintiff is a full-time English professor with the University of the Virgin Islands.

48. Plaintiff incurred out-of-pocket medical expenses for prescription drugs, over-the-counter pain medicine, and co-pays for doctor's visits and physical therapy.

49. Plaintiff incurred towing and repair expenses for her Ford Escape which remains undriveable in its present condition.

## II.    DISCUSSION

The Federal Tort Claims Act ("FTCA") "waives the sovereign immunity of the United States and permits suits for damages for certain acts or omissions by government employees." *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 537 (D.N.J. 2013), *aff'd sub nom. Est. of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239 (3d Cir. 2016). *See* 28

U.S.C. § 2674;[1] 28 U.S.C. § 1346(b)(1).[2] The U.S. Supreme Court succinctly described the broad purpose of the FTCA is "to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws." *Indian Towing Co. v. United States*, 350 U.S. 61, 68 (1955).

The FTCA provides that a claimant "shall," before filing a lawsuit, "present[] the claim to the appropriate Federal agency." *See* 28 U.S.C. § 2675(a); *Martin*, 965 F. Supp. 2d at 538. "The purpose of this requirement is to ensure that the relevant agency has notice of the claim, so that 'it may investigate the claim and respond either by settlement or by defense.'" *Martin* at 538 (citing *Tucker v. U.S.P.S.*, 676 F.2d 954, 958 (3d Cir. 1982)).

The parties agree that Plaintiff filed a timely administrative tort claim pursuant to the FTCA, which was denied by the agency. (ECF No. 64 ¶3.) An essential requirement for establishing liability under the FTCA is that the plaintiff demonstrate negligence or a wrongful act or omission on the part of the government employee, who must be acting within the scope of employment. *Harris v. Boreham*, 233 F.2d 110, 113 (3d Cir. 1956). "This means that for the United States to be liable the federal employee must at the time of his negligent or wrongful act or omission be acting in the line of his federal duties." *Id.* Here, the parties do not dispute that Hearn was acting within the scope of federal employment at the time of the accident. They also agree that the automobile accident at issue occurred at the intersection

---

[1] "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances. . . ." 28 U.S.C. § 2674.

[2] Section 1346(b)(1) describes FTCA jurisdiction and provides in pertinent part:

[T]he district courts. . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages. . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of her office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

of Weymouth Rhymer Highway and New Hernhut Road.[3] *Id.* In addition, the parties agree to the authenticity of Plaintiff's medical records. *Id.*

The United States' liability for an FTCA claim is based on 'the law of the place where the [negligent] act or omission occurred.' 28 U.S.C. § 1346(b); *see also Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law."). To establish a claim of negligence in the Virgin Islands, a plaintiff must prove the following elements: "1) legal duty of care to the plaintiff; 2) a breach of that duty of care by the defendant; 3) constituting fault and legal cause of; 4) damages to plaintiff." *Coastal Air Transp., Inc. v. Scotland*, 75 V.I. 382, 388 (2021) (citing *Machado v. Yacht Haven U.S.V.I.*, 61 V.I. 373, 380 (V.I. 2014)) .

Plaintiff asserts that Hearn owed a duty to Plaintiff to exercise reasonable care in the operation of his motor vehicle. (ECF No. 13-2 ¶19.) And that he breached that duty. *Id.* at ¶20. Hearn, however, argues that if he is found to be negligent, damages awarded should be reduced for Plaintiff's "comparative negligence in causing the accident." (ECF No. 64 at 11.) A defendant found liable for negligence carries the burden of proving that a plaintiff is liable for any contributory negligence. 5 V.I.C. § 1451(a). The Court first considers whether either party was negligent.

### A. Whether Hearn was negligent.

---

[3] Defendant questions whether the March 22, 2023 traffic court hearing held to address the citation Hearn received at the accident precludes the instant civil matter under the doctrine of collateral estoppel. (ECF No 64 ¶7.) The Court sees no reason why the doctrine should apply since the traffic court was not presented with Plaintiff's tort claim. The Court concludes that collateral estoppel is inapplicable. Civil tort claims in district court are filed by injured individuals to recoup financial damages, while traffic tickets—such as the one issued to Hearn—are issued by the territory to punish unsafe driving. *See In re Najawicz*, 52 V.I. 311, 335 (2009) ("First, it is clear that a civil action is '[a]n action to enforce, redress or protect a private or civil right' whereas a criminal action is '[a]n action instituted by the government to punish offenses against the public.'"); *see e.g.*, *Dennie v. People*, 66 V.I. 143, 152 (Super. Ct. 2017) ("The traffic ticket serves as the criminal complaint in criminal cases charging violations of the vehicle and traffic laws of the Virgin Islands, 'whether the complaint is made by a police or peace officer, or by any other person.'"); *see also Post v. St. Paul Travelers Ins. Co.,* 691 F.3d 500, 506 (3d Cir. 2012)("A 'suit' is 'a civil proceeding that seeks damages.'"); *Durga v. Bryan*, Civil Action No. 3:10-cv-1989 (PGS), 2011 U.S. Dist. LEXIS 112638, at *17-18 (D.N.J. Sep. 30, 2011) (finding a differentiation "between *coercive* administrative proceedings begun by the State (i.e., the prosecution of a traffic ticket) and *remedial* actions instituted by an individual seeking redress from a wrong inflicted by the State") (citation omitted).

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 8 of 24

Negligent driving "requires finding beyond a reasonable doubt that a person 'operate[d] a motor vehicle in a negligent manner over and along the public highways . . . in such a manner as to endanger or be likely to endanger any person or property.'" *People of the V.I. v. Joseph*, No. SX-15-RV-006, 2016 V.I. LEXIS 5, at *8 (Super. Ct. Jan. 19, 2016) (citing 20 V.I.C. § 503).[4] Plaintiff maintains that Hearn was negligent "by failing to operate his vehicle in a safe manner." (ECF No. 1.) The Court agrees. Title 20 V.I.C. § 495 mandates that "[t]he driver of a vehicle overtaking and passing another vehicle shall do so on the right side at a safe distance and shall not again drive to the left side of the roadway until safely clear of the overtaken vehicle." 20 V.I.C. § 495. The parties agree that Hearn attempted to pass Plaintiff's vehicle on the left. Section 495 further prohibits a motor vehicle passing another vehicle at an intersection.[5]

Weymouth Rhymer Highway is a single-laned highway in each direction. For eastbound traffic, there is a turning lane for cars to turn right from Weymouth Rhymer Highway onto New Hernhut Road. But for westbound traffic, there is no turn lane before New Hernhut Road because New Hernhut Road ends at Weymouth Rhymer Highway. There is a double yellow center line on the right-hand side of the westbound lane bordering an area of space between the lanes of traffic—however, it is *not* a turning lane. Hearn, who was traveling westbound behind Plaintiff, testified that he observed Plaintiff's vehicle in front of him veer to the right into that double-yellow-lined area in between the eastbound and westbound lanes. According to Hearn, Plaintiff's turn signal was not illuminated, her vehicle had moved out of his lane, and therefore he continued straight. Plaintiff, on the other hand,

---

[4] It is "unlawful for any person to operate a motor vehicle in a negligent manner over and along the public highways" of the Territory. 20 V.I.C. § 503. "[T]o operate in a negligent manner" means "in such a manner as to endanger or be likely to endanger any person or property." *Id.*

[5] "No motor vehicle shall overtake and pass another motor vehicle on a curve, at the intersection of another road, or when approaching the top of a hill. No motor vehicle shall overtake and pass another vehicle in violation of traffic control signals, road stripings or markings. If there are no signals, road stripings or markings, no motor vehicle shall overtake and pass another unless the road ahead is clear of other vehicles, pedestrians or other obstructions for a distance of not less than 200 feet. The driver of a vehicle overtaking and passing another vehicle shall do so on the right side at a safe distance and shall not again drive to the left side of the roadway until safely clear of the overtaken vehicle." 20 V.I.C. § 495.

testified that she was in the single westbound lane preparing to make a lefthand turn, and that she did not veer right.

Hearn stated that he had often seen vehicles move into that double-yellow-lined area and proceed straight across the New Hernhut intersection to make a right turn at the following intersection. However, for Plaintiff to continue straight to the next intersection, she would have had to drive the wrong way against traffic in the eastbound turning lane in front of her. What both parties do agree upon, is that Hearn attempted to pass Plaintiff on the left at the intersection, and as soon as the left side of Hearn's vehicle was almost in line with New Hernhut Road, his vehicle was struck on the right side by Plaintiff's vehicle. Where exactly the vehicles were at that moment is unclear.

According to Hearn, Plaintiff's turn signal at the rear of her vehicle was not illuminated, and Hearn assumed that Plaintiff intended to proceed straight at the intersection. But he was mistaken. Regardless of what Plaintiff's intentions appeared to be, Hearn illegally passed Plaintiff's vehicle on the lefthand side at the intersection of New Hernhut Road and Weymouth Rhymer Highway in violation of 20 V.I.C. § 495. Accordingly, the Court finds that Hearn operated his vehicle in a negligent manner by attempting to pass Plaintiff's vehicle on the left at an intersection and that his actions were a proximate cause of the accident on November 29, 2022, from which Plaintiff suffered damages.

### B. Whether Plaintiff was contributorily negligent.

As was the case with Hearn, it is unlawful for Plaintiff to "operate a motor vehicle in a negligent manner over and along the public highways of this Territory." 20 V.I.C. § 503. A plaintiff is contributorily negligent if she is also at fault—but speculation is not dispositive on the theory of negligence. *Gov't of the V.I. v. Pant*, D.C. Civ. 93-211, 1994 U.S. Dist. LEXIS 9640, at *6 n.6 (D.V.I. July 6, 1994). "If there is evidence suggesting that a plaintiff's actions contributed to her own injury it must be presented to the fact finder which may then allocate fault accordingly." *Machado*, 61 V.I. at 398 (citing 5 V.I.C. § 1451(a)).

Defendant asserts that the direct cause of the accident at issue was the lack of a visible blinking left turn signal at the rear of Plaintiff's vehicle, which would have alerted Hearn— who was following her—that she was making a left turn. In addition, Defendant attributes

cause of the accident to Plaintiff's failure to stay as close as possible to the left side of the roadway before initiating her left turn at New Hernhut Road. (ECF No. 66 at 9.)

Title 20 V.I.C. § 495 provides that "[e]very driver of a motor vehicle shall indicate his intention of starting, stopping, turning, or backing by signals prescribed by the Police Commissioner." 20 V.I.C. § 495(d). Moreover, pursuant to the Virgin Islands Rules and Regulations: "[n]o person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal. . . in the event any other vehicle may be affected by the movement." 20 V.I.R.&R. § 495-1(a). "Any signal of intention to turn right or left shall be given continuously during the last 100 feet traveled by the vehicle before turning." *Id.* at Sec. 495-1 (b). The signal required for a turn "shall be given either by means of light or hand and arm." *Id*. at Sec. 495-1(c). A light turn signal to the left must be given by "flashing the left turn signal for a left turn, resulting in a light signal by the blinking of the rear left tail lamp and the front left direction lamp." *Id*. at Sec. 495-1(c)(1)(B).

Hearn testified that Plaintiff's left turn signal was not illuminated on her vehicle while he was driving behind her. And although Plaintiff testified that she employed her left turn signal before turning left, Officer Charles testified that after the accident the left turn signal was not illuminated on the outside of the vehicle. Significantly, however, both Plaintiff and Hearn testified that after the accident, the signal appeared to function inside the car at the dashboard, yet, the signal was not flashing at the rear of the vehicle. Even though Plaintiff thought her "rear left tail lamp" was illuminated, there is no testimony to contradict Hearn's eye-witness account that Plaintiff's turn signal was not illuminated. Hearn was driving behind Plaintiff's vehicle. Nothing in the record supports the contention that Plaintiff's signal was illuminated at the rear of her vehicle. Rather, Plaintiff's contention that she employed a turn signal while driving is met with testimony from Officer Charles, Hearn, and Plaintiff herself, personally observing that after the accident the exterior turn signal was not flashing on even when the dashboard inside the vehicle indicated that it was.

Under a contributory negligence theory, the burden is on Defendant to demonstrate Plaintiff's negligence. Plaintiff had a duty to ensure that her rear turn signal lights were

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 11 of 24

operable. However, a breach of that duty would occur when Plaintiff was put on notice that her tail light was inoperable and that she failed to act reasonably in correcting any inoperability.

Here it is undisputed that the turn signal was employed. Although Defendant asserts that the signal was not illuminated at the exterior of the vehicle when Plaintiff was driving behind Plaintiff's automobile, there is no evidence on record as to when the exterior signal ceased to function as to establish that Plaintiff breached any duty to ensure that the left turn signal was operable. Without establishing that Plaintiff was on notice that her rear left signal light was inoperable, Plaintiff cannot be found to be negligent for failure to operate her vehicle with an inoperable tail light. Such a finding would impose strict liability for having an inoperable rear signal light. The law does not command such a result.

To be sure, the parties agreed that the interior signal was employed. Thus, the Court finds insufficient evidence to determine whether Plaintiff's rear left tail lamp on her vehicle was illuminated or "blinking" to signal a left turn in accordance with 20 V.I.R.&R. § 495-1(c)(1)(B). Further, the Court finds insufficient evidence to determine at what point the turn signal malfunctioned, since the dashboard indicated the light was functioning properly when employed. Accordingly, the Court has insufficient evidence to determine that Plaintiff operated her vehicle in a negligent manner by making a left turn without a left turn signal at the intersection of New Hernhut Road.

As for staying left on the roadway, section 495(c) of Title 20 of the Virgin Islands Code provides that "[o]n turning to the left into another road, the driver of a motor vehicle shall keep as close to the left as safety permits." The Court heard conflicting testimony as to whether Plaintiff was driving "as close to the left as safety permits" when she attempted a left turn on to New Hernnhut Road. Defendant argues that Plaintiff's vehicle strayed to the right out of Hearn's path of travel, "which allowed Hearn to drive straight ahead in his lane without veering to the left to pass Plaintiff." (ECF No. 66 at 8.) In opposition, Plaintiff testified that her vehicle was in the westbound lane and sufficiently close to the lefthand side.

Clearly, Hearn had space to pass on Plaintiff's left-hand side, but there is a shoulder off the highway. What is not clear is whether Hearn was forced to drive off the highway onto

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 12 of 24

the shoulder when passing Plaintiff's vehicle, or whether he remained in the lane where a legal left turn could have been made onto New Hernhut Road. Hearn testified that he drove straight without leaving the westbound lane or having to drive on the shoulder. This is only possible if Plaintiff's vehicle was far enough to the right and at least partially in the yellow-lined median.

Based on the testimony presented—which is the only relevant evidence before the Court—the Court could arguably find Plaintiff was negligent because of where she initiated her left turn from. Arguably, the Court could also find Plaintiff negligent due to the apparent malfunction of her vehicle's turning signal. Nevertheless, even if the Court was persuaded by Defendant's testimonial evidence, proof of negligence does not complete Defendant's burden here. *See* 5 Personal Injury--Actions, Defenses, Damages § 17.02 (2026). "There is the further and more crucial question of proximate cause." *Id.* "Proximate cause is established where the party who bears the burden shows that an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act." *Miller v. V.I. Wheel Estate, LLC,* 75 V.I. 331, 337 (V.I. 2021) (citation omitted). "Proximate or legal causation is 'that point at which legal responsibility should attach . . . as a matter of fairness'" because of a showing that the negligent act "was a 'substantial factor' or a 'substantial cause,' as opposed to an 'insignificant cause' or a 'negligible cause,' in bringing about the . . . harm." *Chetty Holdings Inc. v. NorthMarq Cap., LLC*, 556 F. App'x 118, 121 (3d Cir. 2014) (citation omitted); *see also Brady v. Cintron*, 55 V.I. 802, 823-24 (2011) ("If there are multiple negligent acts that could have caused the injury, then the negligent conduct must be shown to have been a substantial factor in causing the harm.") An "actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."[7] Restatement (Second) of Torts § 431.

---

[7] The following considerations "are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

   (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 13 of 24

The Court does not find the lack of an illuminated exterior turn signal or the disputed placement of Plaintiff's vehicle in the roadway to be the "substantial factor" in causing the harm that resulted from the accident at issue. If Defendant had not attempted to pass Plaintiff's vehicle on the left at an intersection—whether Plaintiff's turn signal was illuminated or not—she could have made the turn without incident, even if she made the turn from the far right of the lane. There is only *one* lane of traffic where vehicles may legally cross the intersection westbound, as marked by the double yellow lines. Hearn testified that Plaintiff was in the middle portion of the road, and that he expected her to travel straight through to make a right turn at the next light. Hearn testified that he based that expectation on having previously witnessed other drivers cross the intersection into the center lane on the other side of the intersection—driving against traffic—to turn right at the next signal. Indeed, the Court does not doubt Hearn's testimony. However, to avoid liability for negligence here, Defendant cannot rely on what Hearn witnessed other drivers do in the past. By passing Plaintiff on the left-hand side of a single lane at an intersection, Hearn created a force which was in "continuous and active operation up to the time of the accident." Restatement (Second) of Torts § 433. Even if Plaintiff failed to illuminate her rear turn signal, such a situation was "harmless unless acted upon by other forces" for which Plaintiff was not responsible. *Id.* Accordingly, the Court finds Plaintiff is not liable for contributory negligence.

Having found Hearn's negligence to be the proximate cause of the accident at issue and the substantial factor in cause of resulting harm, the Court will now address damages.

### C. Damages

Plaintiff seeks damages for medical expenses, repairs and expenses associated with her vehicle, and non-economic damages. (ECF No. 13-2 at 13.)

In February 2024 Plaintiff submitted an administrative tort claim to CBP assessing her property damage in the amount of $7,743.98 and her personal injury damages in the

---

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
(c) lapse of time.

Restatement (Second) of Torts § 433..

amount of $250,000, for a total of $257,743.98. (ECF No. 1-2.) Plaintiff states that her current vehicle repair damages and estimates, performed to date, are $1,883.78 "with additional repairs needed pursuant to the estimates provided." In addition, Plaintiff claims the present value of past medical expenses is $67,887.29. As for non-economic damages, Plaintiff claims "pain and suffering, mental anguish, and loss of enjoyment of life," that "have accrued in the past, and will continue into the foreseeable future." (ECF No. 13-2 ¶13.) The Court took judicial notice that Plaintiff's life expectancy is 15.1 years. (*See* ECF No. 92.)

Plaintiff has presented undisputed evidence that her injuries are permanent and that her future non-economic damages will likely persist for the remainder of her life. Dr. Quinones stated at the bench trial that "any force or forceful force can trigger inflammation and pain in a spine with multi-level degeneration," such as in Plaintiff's case. Dr. Quinones also testified that before the accident Plaintiff experienced no pain, and in Dr. Quinones' opinion, Plaintiff's injuries are related to the November 29, 2022 car accident. The Court finds Plaintiff has met her burden of proof for mental and physical pain and suffering, and for loss of enjoyment of life.[8] Within hours after the accident, Plaintiff began experiencing neck, shoulder, and wrist pain. (ECF 68 No. ¶36). Her testimony of reduced physical activity is corroborated by her medical records which demonstrate she has experienced chronic pain since the accident, she was prescribed pain medication, and she has undergone epidural steroid injections to manage the pain. *Id.* at ¶43. Based on this evidence, the Court finds that the amount Plaintiff claimed in 2024 for personal injury damages is reasonable. However, Plaintiff now petitions the court for damages beyond what she claimed in 2024. Plaintiff concedes that property damages have not changed since 2024 but contends that damages associated with her "level of pain and suffering should be increased based upon newly

---

[8]"Loss of enjoyment of life" injuries are "those injuries that prevent the injured person from leading what would have been a normal lifestyle." See Damages in Tort Actions, ch. 8, *Loss of Enjoyment of Life* (Matthew Bender). "Loss of enjoyment of life results from those mental or physical injuries that foreclose or limit an injured person's ability to engage in certain activities the person previously enjoyed or anticipated pursuing in the future. The activities may be job-related or may deal solely with the amenities of life—recreational, social, and family activities—that are not pursued for economic gain. . . .Whether termed 'loss of enjoyment of life,' 'incapacity to live a normal life,' 'impairment,' 'restriction of physical activities,' or 'inconvenience,' the injury represents an identifiable detriment to the injured party." *Id*. at § 8.01.

discovered evidence and intervening facts." *Id.* at 15. Plaintiff does not provide an estimate of what she believes that sum increase should be.[9]

The FTCA requires all claimants to present a sum certain claim for damages when completing an administrative claim. "By the terms of the statute, damages are capped at the amount set forth in the administrative claim presented to the agency, that is, the SF-95 filed by a plaintiff." *Id.* at *13 (citing 28 U.S.C. § 2675(b) (providing that an action "shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency")). This "advances Congress's purpose in requiring administrative presentment, which is to encourage the settlement of meritorious claims." *White-Squire v. United States Postal Serv.*, 592 F.3d 453, 459 (3d Cir. 2010) (citation omitted). However, the FTCA provides an exception for recovering more in court than what was sought from the government agency if "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts." 28 U.S.C. § 2675(b).[10]

Here Plaintiff asserts that her injuries are permanent and continuing in nature and that "newly discovered evidence" and "intervening facts" justify additional damages beyond the personal injury damages claimed in her administrative claim. Defendant, on the other hand, contends that Plaintiff is only entitled to recovery of the amount of damages stated in her administrative claim.

Circuit courts are split as to the exact standard for 'newly discovered evidence not reasonably discoverable,' and "[u]nfortunately, there is a dearth of Third Circuit precedent on this issue." *Bravo-Garcia v. United States*, No. 13-2185 (NLH/JS), 2015 U.S. Dist. LEXIS 4727, at *12 (D.N.J. Jan. 15, 2015). Despite the lack of binding precedent from the Third Circuit, other circuit courts have articulated several different tests for determining whether

---

[9] Plaintiff asserts that "[s]he has lost earnings and her ability to earn in the future has been impaired," but Plaintiff provides no details to the Court to support this assertion. (*See* ECF No. 13-2 ¶21.) At the bench trial, Plaintiff testified that she works full time as a professor at the University of the Virgin Islands, although modifications were necessary to accommodate her physical limitations.

[10] If a claimant discovers *during* the administrative claim process that the damages will exceed the initial estimate, the claimant is permitted to amend the claim "at any time prior to final agency action." *See* 28 C.F.R. § 14.2(c); *White-Squire*, 592 F.3d at 459.

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 16 of 24

an FTCA claimant has presented "newly discovered evidence" or demonstrated the existence of "intervening facts" within the meaning of § 2675(b). These various tests include the "worst-case prognosis test,"[11] the "reasonably discoverable/foreseeable test," and the "change in expectations test."[12] *Bravo-Garcia,* 2015 U.S. Dist. LEXIS 4727, at *12. Although the Third Circuit has not yet adopted a particular test, "the majority of district courts in the Third Circuit, as well as the majority of other circuit courts have applied the reasonably discoverable/reasonably foreseeable test," which "focuses on whether it was foreseeable that the plaintiff's injuries would worsen beyond the original claim." *Torres v. United States*, No. 5:21-cv-04953, 2022 U.S. Dist. LEXIS 104734, at *15-16 (E.D. Pa. June 13, 2022) (citations

---

[11] Under the 'worst-case prognosis test' a plaintiff may only amend a damages claim if the newly discovered evidence reveals facts which surpass the worst-case scenario that could have been anticipated by a plaintiff when he or she filed the administrative claim. *Low v. United States*, 795 F.2d 466, 471 (5th Cir. 1986) (reversing a jury verdict that exceeded the amount of plaintiff's administrative claim in a medical malpractice case for injuries to a child during birth) "In *Low*, the plaintiff alleged that the defendant committed medical malpractice during her son's birth at a Navy medical facility which caused her son severe permanent injuries. *Id.* When the plaintiff's son was two years old, the plaintiff filed an administrative tort claim seeking $1,275,000 in damages. *Id.* at 468. The plaintiff later increased her claim to $12 million and argued that at the time she filed the original administrative tort claim it was too early to know 'a final prediction' of the extent of her son's injuries. *Id*. at 470. While the district court permitted a jury verdict in excess of the original $1,275,000 claim, the Fifth Circuit reversed, finding that at the time the administrative tort claim was filed the plaintiff knew the 'worst-case prognosis' for her son 'was one of great severity.' *Id.* at 471. In other words, according to the Fifth Circuit, a plaintiff must predict not only what is within the reasonable universe of injuries or damages but must assume the worst-case could occur in making a FTCA demand*." Bravo-Garcia,* 2015 U.S. Dist. LEXIS 4727, at *12-13; *see also Diawara v. United States*, No. 18-3520, 2020 U.S. Dist. LEXIS 40131, at *5 (E.D. Pa. Mar. 9, 2020) ("The First and Fifth Circuit Courts of Appeals have adopted a 'worst-case prognosis test,' under which 'there is first a subjective test as to whether the specific injuries were known at the time the administrative complaint was made' and 'there is an objective test as to whether the plaintiff could have made out its worst-case scenario based on the basic severity of the injuries that were known.'") (citation omitted); *Salas v. United States*, Civil Action No. 16-2485 (SRC), 2021 U.S. Dist. LEXIS 4586, at *15-16 (D.N.J. Jan. 11, 2021) ("[W]hen employing the worst-case scenario to evaluate the Section 2675(b) exception, '[t]he mere fact that these dread consequences, feared from the beginning, had become more certain does not suffice to brand them 'newly discovered.'") (citing *Reilly v. United States*, 863 F.2d 149, 172 (1st Cir. 1988)).

[12] The "change in expectations" test approach was adopted by the Eleventh Circuit in *Fraysier v. United States*, 766 F.2d 478 (11th Cir.1985). In *Fraysier*, the United States appealed the District Court's decision to award the plaintiff a judgment of $275,000 in damages—in contrast to the $ 50,000 claim presented to the agency. The plaintiff had sued the United States following an extreme reaction to the swine flu vaccine. The plaintiff later increased his claim when he was diagnosed with Guillain-Barre Syndrome which caused permanent injury. The circuit court opined that the "legal question becomes whether this change in expectation, reasonably based, is newly discovered evidence within the meaning of the statute." In applying Section 2675(b), the Eleventh Circuit permitted damages above the amount claimed finding that at the time the original administrative claim was filed, plaintiff had no reason to believe that his condition would be permanent. The Court stated "[p]laintiff should not be charged with knowing what the doctors could not tell him." *Id.* at 481.

omitted); *Highhouse v. United States*, Civil Action No. 14-140, 2017 U.S. Dist. LEXIS 47160, at *31 (W.D. Pa. Mar. 30, 2017) ("[T]he Second, Fourth, Sixth and Eighth Circuits have adopted a reasonably discoverable or reasonably foreseeable test to determine if 'newly discovered evidence' or 'intervening facts' are present."); *Diawara*, 2020 U.S. Dist. LEXIS 40131 at *4-5 ("[I]n determining whether a claimant has satisfied her burden, trial courts in the Third Circuit often apply the 'reasonably discoverable' test of the Fourth, Sixth, Eleventh, and D.C. Circuit Courts of Appeals," which "permit[s] increasing a claim 'when the claimant either did not know or reasonably could not have known the severity of the injury at the time the FTCA tort claim notice was filed.'")(citation omitted). "The reasonably foreseeable test examines whether there is evidence that a plaintiff's injury, though known when they filed the administrative claim, 'worsen[ed] in ways not reasonably discoverable by the claimant and his or her treating physician.'" *Osorio-Jimenez v. United States*, Civil Action No. 20-7009 (SRC), 2023 U.S. Dist. LEXIS 212031, *6 (D.N.J. Nov. 29, 2023) (citations omitted.);[13] *see also Michels v. United States*, 31 F.3d 686, 688 (8th Cir. 1994) (affirming that a "known injury can worsen in ways not reasonably discoverable by the claimant and his or her treating physician, [and] such 'newly discovered evidence' or 'intervening facts,' if convincingly proved, can warrant § 2675(b) relief"). Because the Court finds the "reasonably discoverable/reasonably foreseeable test" to be consistent with the intent of the statute, and reasonably uniform within the Third Circuit, the Court will apply the "reasonably discoverable/foreseeable test" to determine whether Plaintiff may avail herself of the exception set forth in section 2675(b).

Plaintiff presented undisputed evidence corroborated at the bench trial that she sustained physical injuries causing bodily pain, for which she sought and received medical treatment. Therefore, the Court's analysis is limited to the issue of whether those specific injuries became worse in a way that was not foreseeable when Plaintiff filed her Notice of

---

[13] In *Osorio*, the claimant underwent unsuccessful spinal fusion surgery, and although the court found that Plaintiff's injuries had worsened, they had not changed and were of the "same general nature outlined in his SF-95—namely, injuries to his 'upper, lower, and mid back.'" *Osorio-Jimenez,* 2023 U.S. Dist. LEXIS 212031, at *8. In denying his claim for additional damages, the court found—under the reasonably discoverable/reasonably foreseeable test—that the claimant "was in possession of adequate facts at the time he filed the underlying complaint—his persistent and worsening pain and history of medical care to date—that it was reasonably foreseeable he might undergo spinal fusion surgery at some point in the future." *Id.*

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 18 of 24

Tort Claim in February 2024, approximately 15 months after the accident. Upon review of the record, including the medical evidence presented, it appears that Plaintiff has not met this standard. While Plaintiff's injuries from the November 29, 2022 collision may require additional treatment and/or surgical intervention, the claimed injuries themselves have nonetheless remained the same as claimed on her SF-95: "severe neck and back pain." (ECF No. 1-2.) *See Woods v. Fata*, Civil Action No. 20-2221 (MAS) (RLS), 2022 U.S. Dist. LEXIS 218388, at *12-13 (D.N.J. Dec. 5, 2022).[14]

When Plaintiff first sought medical assistance at the emergency room at SRMC on December 1, 2022—days after the accident—she complained of "neck, shoulder, back, hands/wrist pain" and "headache" that resulted from the November car accident. (Ex. M-003.) To address the back and neck pain, x-rays were taken of the lumbar spine[15] and cervical spine.[16] (Ex. M-012.) No spine fractures were found. However, the resulting radiologist

---

[14] In *Woods*, the plaintiff was involved in a motor vehicle incident and defendants argued that his injuries and economic damages were reasonably foreseeable when he filed his SF-95 in January 2020. Plaintiff complained of symptoms related to his left lower extremity, lower back, right upper extremity, and cervical spine, and was diagnosed with cervical strain and cervical radiculopathy. His doctor prescribed pain medications and ordered physical therapy and magnetic resonance imaging ("MRIs") of Plaintiff's cervical and lumbar spines. Plaintiff underwent physical therapy for his neck, left upper extremity lower back, and left leg pain. Three years later, in 2021, another medical report reiterated that Plaintiff "had sustained permanent injuries to both cervical and lumbar spine" as a result of the motor vehicle accident and that Plaintiff continued to undergo treatment for his injuries and "may require possible surgical treatment for his lumbar spine in the future." Plaintiff contended that he only became aware of the long-term consequences of the accident at issue following his appointment with his physician in 2021—"specifically, the need for additional surgeries, radiological assessments, pain management procedures, and physical therapy." *Woods*, 2022 U.S. Dist. LEXIS 218388, at *10-11. The Court found that "while Plaintiff's injuries may have worsened since the February 27, 2018 collision and may require additional treatment and/or surgical intervention, the claimed injuries themselves have nevertheless remained the same as claimed on his SF-95" and the diagnoses and treatment recommendations were "not dissimilar to Plaintiff's diagnoses and treatment plan prior to filing suit." Further, "even if Plaintiff's future medical expenses will ultimately amount to more than Plaintiff initially anticipated. . . actual expenses are not the touchstone of the § 2675(b) exception." *Id.* at *12-13 (citation omitted).

[15] December 1, 2022 x-ray results of "STUDY: AP, lateral, and L5-S1 lateral spot view of the lumbar spine. FINDINGS: . . . No acute displaced lumbar spine fracture. Mild to moderate multilevel degenerative changes including joint space narrowing, facet arthropathy and anterior and lateral osteophytes, greatest at L2-L3 through L5-S1. Mild leftward curvature of the lumbar spine centered at L2. Mild retrolisthesis of L2 on L3, L3 on L4 and L4-LS. No appreciable widening of the sacroiliac joints.
IMPRESSION:
1. No demonstrated displaced lumbar spine fracture
2. Mild-to-moderate multilevel lumbar spondylosis; greatest at L4-L5."
(Def's Ex. M-004.)
[16] December 1, 2022 x-ray results of STUDY: AP, lateral, odontoid views of the cervical spine. FINDINGS: Lateral cervical spine is imaged from the skull base to C7-T1. ALIGNMENT: Mild straightening of the normal cervical

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 19 of 24

report stated findings of "mild retrolisthesis of L2 on L3, L3 on L4 and L4-L5." (Ex. M-008.) Findings also included "mild to moderate multilevel lumbar spondylosis; greatest at L4-L5" and 'mild multilevel cervical spondylosis; greatest at C6-C7." (Ex. M-008.) In addition, findings included "multilevel degenerative changes." *Id*. Plaintiff was diagnosed with "lumbar strain" at that point. (Ex. M-012.)

After pursuing follow up treatment with Dr. Jones, Plaintiff began seeing Dr. Quinones for her persistent back pain in June 2023—about seven months before she submitted her administrative claim. Plaintiff's subsequent treatment included various MRI's at St. Thomas Radiology and Associates, Inc., which assessed Plaintiff's progress. Dr. Quinones performed five procedures on Plaintiff between October 2023 and February 2025. (*See* Ex. 31.) The first procedure—a lumbar facet joint nerve block—was performed on October 6, 2023, about four months before Plaintiff submitted her administrative claim. Her first MRI, also performed in 2023—before Plaintiff filed her administrative claim—showed:

> L2-L3 and L3-L: "mild to moderate right and mild left neural foraminal narrowing"; L4-L5: "mild spinal stenosis and severe left and moderate to severe right neural foraminal narrowing"; L5-S1: "moderate to severe left and moderate right neural foraminal narrowing." [17]

*Id.*

---

lordosis. Lateral masses of C1 align appropriately over the facet joints of C2. Atlantodental intervals within normal limits. Dens is intact. BONES: Preserved vertebral body heights. No acute fracture or dislocation. DEGENERATIVE CHANGES: Mild multilevel degenerative changes including disc height loss, endplate sclerosis, vertebral body osteophytosis and facet arthrosis; greatest at C6-C7. SOFT TISSUES: Prevertebral soft tissues and visualized lung apices are normal.
IMPRESSION:
1. No acute finding in the cervical spine.
2. Mild multilevel cervical spondylosis; greatest at C6-C7.
 (Ex. M-008.)

[17] Dr Quinones testified that the presence of bone spurs found in Plaintiff's spine is a degenerative condition. "Bone spurs on the vertebrae extend into the spinal canal, narrowing the space and pinching nerves in the spine." https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last visited July 2, 2026). As early as September 15, 2023—about five months before Plaintiff presented her administrative claim—the results from her first MRI report included: 1)"Multilevel degenerative changes of the lumbar spine" with finds most significant at L4-L5 "where there is a broad-based disc bulge with moderate to severe facet arthropathy. There is resultant mild spinal stenosis and severe left and moderate to severe right neural foraminal narrowing; 2) Broad-based disc bulge at L5-S1 with resultant moderate to severe left and moderate right neural foraminal narrowing. There is no spinal stenosis; 3) Grade 1 approximately 4 mm anterolisthesis of L5 on S1 and approximately 3 mm retrolisthesis of L3 on L4 and L4 on L5." (Ex. 31 000154.)

Dr. Quinones testified that this report "harmonized" with the findings from Plaintiff's x-rays. The report from the subsequent MRI performed on November 1, 2024, indicated spondylolisthesis.[18] Dr. Quinones testified that Plaintiff's pain was likely the result of an existing degenerative condition that was triggered by the accident. In other words, it aggravated Plaintiff's degenerative condition. This condition was identified before Plaintiff submitted her administrative claim, and her diagnosis in 2026 is sufficiently similar.

The medical report submitted at the 2026 bench trial identified Plaintiff's current diagnoses in two parts: 1) "Lumbar spondylosis"[19] and 2) "Lumbar osseous neural canal stenosis."[20] (*See* Ex. 40.) Although Plaintiff's initial diagnosis at the emergency room was

---

[18] Spondylolisthesis is defined as "forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." *See* Dorland's Illustrated Medical Dictionary, 1725 (33rd Ed. 2020). Degenerative spondylolisthesis "happens as your body naturally ages and the disks that cushion the spaces between your vertebrae break down (degenerate). As the disks thin, there's more space between your vertebrae, which increases the risk one slips out of place. https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis. (Last visited July 2, 2026.) Isthmic spondylolisthesis occurs "when the bone that connects two vertebrae together (the pars interarticularis) breaks and can't hold its usual alignment." *Id.* Plaintiff's medical record included the following entry: "Spondylolisthesis L5/S1 level (M43.17) Spondylolisthesis, lumbosacral region modified Dec 19, 2024, l34 stenosis and retrolisthesis, l45 retrolisthesis, l5s1 spondylolisthesis likely isthmic degenerative disks l3,4 l45, l5s1." (Ex. 37 000255.) The MRI report dated November 1, 2024, indicated "neural foraminal narrowing" with "multilevel spondylolisthesis." (Ex. 31.)

[19] Spondylosis is "degenerative spinal changes due to osteoarthritis." See Dorland's Illustrated Medical Dictionary, 1725 (33rd Ed. 2020). Cervical spondylosis is defined as "degenerative joint disease affecting the cervical vertebrae intervertebral disks, and surrounding ligaments and connective tissue sometimes with pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots." *Id.* Lumbar spondylosis is defined as "degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes." *Id.* Degeneration of the vertebrae and intervertebral discs is medically referred to as spondylosis. "Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal 'disc space' between the adjacent vertebrae." *Heckelmann v. Colvin*, No. 3:13-CV-00175, 2014 U.S. Dist. LEXIS 71834, at *25 n.19 (M.D. Pa. May 27, 2014).

[20] Stenosis is defined as "an abnormal narrowing of a duct or canal." Dorland's Illustrated Medical Dictionary, 1740 (33rd Ed. 2020); *see also Biller v. Acting Comm'r of Soc. Sec.*, 962 F. Supp. 2d 761, 765 (W.D. Pa. 2013) "Stenosis describes a narrowing of any canal or orifice. . . ." (citing STEDMAN'S MEDICAL DICTIONARY 1832 (28th ed. 2006). "Spinal stenosis is the narrowing of one or more spaces within your spinal canal." https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last visited June 29, 2026). "Spinal stenosis happens when the space around your spinal cord becomes too narrow. This irritates your spinal cord and/or the nerves that branch off it." https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last viewed June 26, 2026). "Lumbar spinal stenosis (LSS) is the narrowing of the lumbar vertebra in the central canal, lateral recess, or neural foraminal areas." https://www.ncbi.nlm.nih.gov/books/NBK531493/ (last visited July 2, 2026). It is "a significant cause of disability in older individuals and a common spinal surgery indication in patients older than 65 years." *Id.; see also Berrocal v. Saul*, No. 2:18-cv-9567, 2021 U.S. Dist. LEXIS

stated as "lumbar sprain," the report from Plaintiff's x-rays taken on December 1, 2022, indicated "multilevel cervical spondylosis" and "mild to moderate lumbar spondylosis." (Ex. 37 000282.) Spondylosis was also recorded as a finding in the medical record in October 2023. (Ex. 37 000254, 000255.) Plaintiff filed her administrative claim four months later in February of 2024. As early as 2023, Dr. Jones noted that Plaintiff's pain had plateaued, and she experienced restricted movement. (ECF No. 33 000164, 000167, 000169.)

The burden is on Plaintiff to show that the exception set forth in section 2675(b) applies. *Schwartz v. United States*, 446 F.2d 1380, 1381 (3d Cir. 1971). Plaintiff proffers as "newly discovered evidence," that "in 2024, Dr. Quinones had not yet opined as to the permanent impairment rating of 15 to 25% whole person impairment, which will impose significant limitations on activities requiring prolonged standing, walking, bending, lifting, or other physical exertion." (ECF No. 68 at 15.) Plaintiff also argues that on September 19, 2025, Dr. Quinones opined that Plaintiff's "prognosis for recovery without more invasive intervention is poor" and recommended "at that point," that Plaintiff "continue pain management with medication, a possible dorsal column stimulator trial, and, as a last resort, multilevel lumbar fusion surgery," which is "highly invasive and results in a loss of mobility that was not foreseeable in 2024."[21] *Id.* at 15 and ¶¶55, 59. The Court notes that Plaintiff did

---

106109, at *18 n.6 (D.N.J. June 4, 2021) ("Lumbar stenosis (spinal stenosis) is a condition whereby either the spinal canal (central stenosis) or one or more of the vertebral foramina (foraminal stenosis) becomes narrowed.") (citation omitted). "Canal stenosis" is a more specific, anatomical term for "spinal stenosis"—both refer to the abnormal narrowing of the spinal canal. "Foraminal stenosis is narrowing that happens in certain places around the nerves that come out of your spinal cord. It's a type of spinal stenosis that affects the neural foramen, a series of openings on both sides of your spine." https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis (last visited June 29, 2026).

[21] After an orthopedic spine evaluation by Dr. John Shuster on December 19, 2024, Plaintiff was diagnosed with "L5-S1 spondylolisthesis (likely isthmic), L3-4 stenosis and retrolisthesis, L4-5 retrolisthesis, and degenerative discs at L3-4, L4-5, L5-S1." (Ex. No. 40 000395.) Plaintiff was informed by Dr. Shuster "that as a last resort she may have to consider spinal fusion surgery that would require a long recovery." (ECF No. 66 ¶31; ECF No. 68 at 15 .) Dr. Shuster "recommended midline epidural steroid injection, pain medication, possible dorsal column stimulator, and as last resort multilevel lumbar fusion (with a long recovery expected)." (Ex. No. 40 000395.) Although Plaintiff did not present to what degree that she intended to pursue these recommendations, or the expected likelihood of success, Dr. Quinones testified that the dorsal column stimulator, and as a last resort the multilevel lumbar fusion procedure could potentially improve Plaintiff's pain stating that if the joint is fused, it does not move, and that would help to minimize the pain because the fusion surgery fuses the joints together. She also stated that inherent in such a surgery is the possibility it would fail, leaving Plaintiff's injuries unchanged or intensified. (Test. Dr. Quinones Mar. 17, 2026.)

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 22 of 24

not specify a decision to pursue these recommendations or provide the success rate expected from such procedures. Nor was a cost estimate for future procedures provided.[22]

While the Court empathizes with Plaintiff, the Court finds no newly discovered evidence presented to substantiate increasing the ad damnum amount that Plaintiff submitted in her SF-95. Plaintiff's injuries are of the same general nature outlined both in her SF-95 and in the medical report submitted by her medical expert at the bench trial. At the time the administrative claim was filed, Plaintiff was experiencing chronic persistent pain without resolve as well as significant impairment to her normal activities.[23] Since filing her administrative claim in February 2024, Plaintiff has attended pain management visits and undergone multiple procedures, but the Court finds Plaintiff's condition has not "worsen[ed] in ways not reasonably discoverable by the claimant and his or her treating physician." *Michels*, 31 F.3d at 688 (applying the "reasonably discoverable" test and finding plaintiff had no signs of a later-developing knee condition at the time his claim was filed and he did not know that he would be permanently unable to manage his family farm; the plaintiff—injured when his motorcycle collided with a government vehicle—originally filed an administrative claim of $450,000, but following a bench trial, was awarded $710,000 in damages). The FTCA does "not permit an increase [to the ad damnum clause] on the grounds that negative outcomes of an expressly contemplated treatment for a known injury do not materialize until some later time." *Salas,* 2021 U.S. Dist. LEXIS 4586, at *23.[24] In light of

---

[22] Plaintiff states that her present value of past medical expenses is $67,887.29 and although surgery could someday be necessary, Plaintiff only references future medical expenses but proves no future expenses or shows the reasonable estimated cost of any future medical expenses. As such, damages cannot be determined with a reasonable degree of certainty. Plaintiff's failure to provide sufficient evidence of future medical expenses for this Court's review precludes such an award. "In the context of a claim for future medical expenses, the movant must prove, by expert testimony, not only that future medical expenses will be incurred, but also the reasonable estimated cost of such services." *Keifer v. Reinhart Foodservices, LLC*, 563 F. App'x 112, 116 (3d Cir. 2014).

[23] Dr. Quinones opines that Plaintiff "suffers from 15 to 25% whole person impairment, which will impose significant limitations on activities requiring prolonged standing, walking, bending, lifting, or other physical exertion." (ECF No. 68 at ¶60.) The doctor also opines that Plaintiff "would have difficulty performing heavy household tasks." *Id.*

[24] In *Salas*, the court declined to increase the ad damnum amount Plaintiff submitted on his SF-95. The court opined that the Plaintiff "knew that his worsening condition had not responded to over a year's worth of numerous treatment approaches and was severe enough to warrant surgery. Further treatment, including

*Wymer v. United States of America*
Case No. 3:24-cv-0041
Memorandum of Decision
Page 23 of 24

Plaintiff's unresponsiveness to treatment from December 2022 to the date she filed her claim in February 2024, the Court finds that it was reasonably foreseeable that she might require procedures such as spinal fusion surgery at some point in the future, which was recommended in December 2024 as a last resort. *See Id. at* *8

Plaintiff was in possession of adequate facts at the time she filed her administrative claim: her persistent chronic pain, her history of medical care to date, and the consistent diagnosis which was attributed to a preexisting degenerative condition that was likely triggered in the accident. Plaintiff was treated for the same injuries and symptoms in December 2022—just days after the accident—that she was experiencing in 2024 when she filed her SF-95 administrative claim, and which are also the same injuries and symptoms she was experiencing in January 2026. Dr. Quinones confirmed this at the bench trial when she was asked whether the pain symptoms and complaints Plaintiff initially experienced in December 2022 at SRMC, and later with Dr. Jones, were the same or similar symptoms that she was experiencing as of January 2026. Dr. Quinones unequivocally stated that they were.

Plaintiff fails to sustain her burden of showing the Court any "newly discovered evidence" or "intervening facts" bearing on her injuries, and accordingly, her claim "must be limited to the amount claimed before the [federal] agency" under 28 U.S.C. § 2675(b).

### III.    CONCLUSIONS OF LAW

---

surgery, and the possibility of permanent physical limitations was clearly within the reasonably foreseeable realm of possibilities, at a time when [Plaintiff] could have presented another administrative claim with a greater sum certain to the Postal Service. *Salas*, 2021 U.S. Dist. LEXIS 4586, at *25. "From the time [Plaintiff] initially sought treatment for injuries in December 2014 to the time the October 2015 SF-95 was filed, his condition consistently deteriorated. In addition to surgery on his right shoulder, [Plaintiff] made repeated attempts to treat his spinal injuries through chiropractic care and physical therapy. Throughout 2015, he received a series of epidural injections to his cervical and lumbar spine. He also underwent two lumbar rhizotomy procedures. Plaintiff himself acknowledged that these conservative approaches had not been successful in achieving lasting relief. As early as October 16, 2015—one week before the October 2015 SF-95 was submitted to the Postal Service—[Plaintiff] consulted a spine surgeon for an evaluation. The surgeon . . . examined [Plaintiff], noted his history, and ordered a lumber discography to evaluate his condition. At the follow-up appointment on January 28, 2016, [the surgeon] advised Plaintiff that his injuries were severe enough to indicate surgical treatment and made very clear to him what the risks and possible negative outcomes of surgery could be. During that visit . . . Plaintiff not only discussed the option of spinal surgery but also reported to the doctor that he had continued to experience significant pain, which had not abated in spite of the various treatments he had undergone." *Id.* at *20-21.

For the foregoing reasons, the Court concludes that Plaintiff is entitled to an award of $257,743.98 as damages on her claim for negligence as to Peter Hearn, an agent for the United States Customs and Border Patrol. The United States, acting through its employee, operated its vehicle in a negligent manner causing damages to Plaintiff. Plaintiff is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961. *See Alkon v. United States*, 239 F.3d 565, 571 (3d Cir. 2001) (holding "that interest on judgments obtained against the United States in the District Court of the Virgin Islands pursuant to the FTCA, should be calculated in accordance with the provisions of 28 U.S.C. § 1961"). An appropriate Judgment follows.

**Dated: August 4, 2026**                              */s/ Robert A. Molloy*
                                                             **ROBERT A. MOLLOY**
                                                             **Chief Judge**